UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| KIMIS A. PORIETIS, ET AL., | ) |
|---|---|
| Plaintiffs, | ) |
| v. | ) Docket no. 2:16-cv-00049-GZS |
| TRADESMEN INTERNATIONAL, LLC, | ) |
| Defendant. | ) |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Before the Court are Defendant's Motion for Summary Judgment (ECF No. 28) and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 29). As explained herein, the Court DENIES both motions.

**I. LEGAL STANDARD**

Generally, a party is entitled to summary judgment if, on the record before the Court, it appears "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. A "material fact" is one that has "the potential to affect the outcome of the suit under the applicable law." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). In

determining whether this burden is met, the Court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. Santoni v. Potter, 369 F.3d 594, 598 (1st Cir. 2004).

Once the moving party has made this preliminary showing, the nonmoving party must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." Triangle Trading Co., Inc. v. Robroy Indus., Inc., 200 F.3d 1, 2 (1st Cir. 1999) (internal quotation marks and punctuation omitted); see also Fed. R. Civ. P. 56(e). "Mere allegations, or conjecture unsupported in the record, are insufficient." Barros-Villahermosa v. United States, 642 F.3d 56, 58 (1st Cir. 2011) (quoting Rivera-Marcano v. Normeat Royal Dane Quality A/S, 998 F.2d 34, 37 (1st Cir. 1993)); see also Wilson v. Moulison N. Corp., 639 F.3d 1, 6 (1st Cir. 2011) ("A properly supported summary judgment motion cannot be defeated by conclusory allegations, improbable inferences, periphrastic circumlocutions, or rank speculation."). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment for the moving party." In re Ralar Distribs., Inc., 4 F.3d 62, 67 (1st Cir. 1993).

District of Maine Local Rule 56 prescribes a detailed process by which the parties are to place before the Court the "material facts . . . as to which the moving party contends there is no genuine issue." D. Me. Loc. R. 56(b). The Rule further requires each statement of material fact to be followed by a "record citation[] . . . to the specific page or paragraph of identified record material supporting the assertion." D. Me. Loc. R. 56(f). Although Local Rule 56 does allow parties to indicate in response to a particular statement of fact that the statement "should be stricken," the party making such a request must still admit, deny, or qualify the statement of fact. D. Me. Loc. R. 56(e). Ultimately, in constructing the narrative of undisputed facts for purposes of

2

summary judgment, the Court deems any statement with a supporting record citation admitted but "may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment." D. Me. Loc. R. 56(f); see also Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

The existence of cross-motions for summary judgment does not change the standard for constructing the undisputed facts.[1] Rather, the Court is required to "view each motion separately and draw all reasonable inferences in favor of the respective non-moving party." Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 89 (1st Cir. 2013).

## II.  FACTUAL BACKGROUND

Tradesmen International, LLC ("Tradesmen") is a Delaware corporation that maintains its corporate headquarters in Ohio and has an office in Portland, Maine. Tradesmen advertises itself as a full-service, construction labor support company that provides skilled labor to its clients, which are primarily construction companies located throughout North America. As of 2014, Frederick Orne was in charge of the Portland office and was the highest-ranking Tradesmen employee in the office.[2] Orne hired Plaintiff Kimis Porietis as a part-time recruiter on June 6, 2014. Orne also hired Plaintiff Michael LeDuc as a field representative on June 11, 2014. At the

---

[1] In this case, although both sides have moved for summary judgment, Plaintiffs' Motion for Partial Summary Judgment concerns a purely legal issue regarding the preclusive effect of prior administrative unemployment proceedings. Therefore, in the following recitation of the facts, the Court "credit[s] the factual account that the [Plaintiffs] prefer[], consistent with record support, and indulge[s] all reasonable inferences favorably to [their] cause." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 257 (1st Cir. 1999).

[2] Notably, Orne passed away prior to the filing of this case.

3

time of their hire, Plaintiffs acknowledged their receipt, review, and understanding of Tradesmen's Office Employee Manual, which sets forth the company's policies and procedures, including as they relate to unlawful discrimination, retaliation, and discrimination in the workplace. Plaintiffs also acknowledged their receipt, review, and understanding of Tradesmen's Zero Tolerance Workplace Harassment Policy & Procedures, which states that an employee can be discharged for making a false harassment complaint.

On September 26, 2014, Orne offered Porietis complimentary admission passes to a strip club, in the presence of another male employee. Porietis declined the passes by telling Orne, "if my wife would return these, you're not going to like where she wants to put them," and that Orne "would not appreciate getting the cards back from [Porietis's] wife."[3] (Deposition of Kimis A. Porietis ("Porietis Dep.") (ECF No. 32) at 58-59.)[4] Orne seemed "shocked" by the refusal, but he did not discuss the issue further with Porietis. (Porietis Dep. at 59.) Unbeknownst to Porietis, Orne subsequently told LeDuc that Porietis was "a pain in the ass," "that we need to . . . find a way to get rid of him," and that Orne was going to cut Porietis's hours based on his refusal to accept the strip club passes. (Deposition of Michael LeDuc ("LeDuc Dep.") (ECF No. 33) at 49-50.) Orne told LeDuc that Porietis said he refused the passes because "he was a Christian man and that he would never do such a thing, he would never hurt his wife." (Id.) Orne also asked LeDuc to "spy" on Porietis and report back anything that Porietis might say. (LeDuc Dep. at 50.)

---

[3] In relating this incident, the Court draws upon Porietis's deposition rather than his subsequent affidavit (ECF No. 36-3). To the extent that this affidavit contradicts his deposition testimony in several material ways without explanation, the affidavit violates the so-called "sham affidavit" rule. See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.")

[4] Citations to depositions refer to the transcript page numbers. Citations to other documents refer to Page ID #s.

On October 2, 2014, Orne met with Porietis and informed him that he would be reducing his hours. Orne stated that the reduction in hours was a reflection of a seasonal decline in Tradesmen's business.[5] At no point between being offered the strip club passes and having his hours reduced did Porietis tell Orne that he was going to make a complaint about the offer. Other than one female employee's stated concern to Porietis about Orne's suggestion to put strip club passes in field employees' paychecks, Porietis was not aware of any Tradesmen employees who felt offended or harassed by Orne's offering of the passes to other male employees.

On October 3, 2014, Porietis contacted Tradesmen's then corporate counsel, Kristin Erenburg. He told her that Orne was not following proper procedures for processing new field employees at the Portland office and that Orne had offered him strip club passes. Specifically, Porietis told Erenburg, "I didn't think that [offering the passes] was correct behavior in a workplace for—that women would have to work around that, and—and that was I thought very unprofessional. I thought it was, you know, embarrass[ing] to the company." (Porietis Dep. at 56.) Porietis also told Erenburg that he was going to contact the Maine Human Rights Commission concerning his belief that Orne had retaliated against him for refusing the passes by cutting his hours. That same day, Porietis did call the Commission, reported Orne's alleged retaliatory action, and filled out the Commission's intake form. Tradesmen investigated the strip club passes issue over the following week. During the investigation, Orne admitted that he had offered passes to Porietis and to two other male employees outside the office. Tradesmen disciplined Orne. The corrective action form detailing the discipline for this incident is dated October 16, 2014.

During this period of time, Orne told LeDuc that he believed Porietis was filing a lawsuit about his alleged retaliatory action. Orne also reiterated to LeDuc over multiple conversations that

---

[5] The parties dispute whether the Portland office was actually experiencing or expecting a seasonal downturn, but this factual dispute cannot be resolved in the context of summary judgment.

5

Orne thought Porietis was a "troublemaker" because he did not accept the passes and that Orne wanted to "get rid of him." (LeDuc Dep. at 55.) Erenburg also called LeDuc and asked him to report on Porietis, saying that she was in agreement with what she understood to be Orne's attempt to get rid of Porietis by cutting his hours because Porietis was a "problem." (LeDuc Dep. at 62-63.)

On October 15, 2014, Porietis, LeDuc, and another Tradesmen employee, Bernie Mailloux, represented Tradesmen at a job fair at a shopping mall in Bangor, Maine. Next to the table reserved for Tradesmen were two other job fair participants, one of which was the Bangor Police Department. The Bangor Police Department's table was approximately 18 to 24 inches away from Tradesmen's table and was staffed by two uniformed police officers.

Mailloux drove Porietis part of the way to the job fair. Mailloux was not happy to attend the fair, and during the drive from Portland, he informed Porietis that he was only going to take him as far as Topsham, Maine, repeatedly screamed at Porietis about not being a "team player," and drove erratically. (Porietis Dep. at 79-83.) Porietis transferred from Mailloux's vehicle to LeDuc's in Topsham. Porietis told LeDuc during the remainder of the drive to Bangor that he had thought he was going to be killed due to Mailloux's erratic driving, that Mailloux is a "whack, [a] wing nut," and that Mailloux had been "really aggressive" with him. (Porietis Dep. at 84-85.)

Later, at Tradesmen's table at the job fair, Mailloux, who is a "big guy," began aggressively and loudly berating LeDuc about standing in front of Tradesmen's table sign. (Porietis Dep. at 93-94; LeDuc Dep. at 101.) During this first altercation, Porietis "just rolled [his] eyes, like this is getting a little crazy," and LeDuc "blew it off because [he] was with" job applicants. (Porietis Dep. at 98; LeDuc Dep. at 101.) Mailloux left the table and LeDuc told Orne via text message that Mailloux was being negative, without realizing that Mailloux was included on the chain of text

6

messages. Mailloux returned, informed LeDuc that he had seen the text about him, and was angry. LeDuc tried to discuss with Mailloux who would drive Porietis back to Portland after the fair because LeDuc had an appointment in Lewiston, Maine. Mailloux aggressively and profanely told LeDuc that he was going to have to take Porietis back to Portland at the end of the fair, stood over the table, "got in [LeDuc's] face," and started "spitting" and cursing at him. (Porietis Dep. at 105-06, 110; LeDuc Dep. at 103.) During this altercation, Porietis was afraid for LeDuc's safety and LeDuc "started to think [Mailloux] might even hit [him], because he was crunching his fists." (Porietis Dep. at 110; LeDuc Dep. at 103.) Mailloux again stepped away from the table for some period of time, then returned, cursed at LeDuc and Porietis, told them he was leaving, and pushed the table. At least one job applicant was at the table when Mailloux first got in LeDuc's face and when Mailloux pushed the table.

After Mailloux left, LeDuc called Orne and told him what had happened. LeDuc reported to Orne that the incident "was violent and [he] said [he] was also afraid [Mailloux] was going to hit [him]." (LeDuc Dep. at 105.) LeDuc was afraid to return to the office because of Mailloux's behavior and told Orne, "You better take care of it because I'm not going to go back in the office with a guy that's treating me like this, okay." (LeDuc Dep. at 123.) Porietis was "really upset" about the incident and LeDuc was "upset and nervous and really scared" and felt "threatened" by Mailloux's behavior. (LeDuc Dep. at 106-07.) Neither Porietis nor LeDuc reported Mailloux's behavior to the police officers. Porietis returned to the Portland office later that day to drop off the job fair participant applications but went into the office with his wife to ensure that Mailloux did not "try to start anything." (Porietis Dep. at 117.)

On October 17, 2014, Porietis called the Portland office and indicated that he wanted to make an incident report about what happened at the job fair and that he "didn't feel safe with"

7

Mailloux.  (See Rule 30(b)(6) Deposition of Jeannie Woodall ("Tradesmen Dep.") (ECF No. 34) at 68.)  Erenburg subsequently called Porietis and he told her about the incident, referring to it as "the brawl at the mall."  (Porietis Dep. at 120.)  Porietis also talked to Frank Muscarella, Tradesmen's Area Manager for New England, on the phone.  Porietis told Muscarella about the incident, as well as perceived ongoing violations of company regulations occurring in the Portland office, and Muscarella told him that he was being placed on administrative leave pending a full investigation of the job fair incident.  At some point, Porietis contacted the Bangor Police Department to see if the police officers or anyone else had reported anything.

Meanwhile, in the days after the job fair, LeDuc repeatedly asked Orne if he had done anything about Mailloux, but Orne "kept putting [him] off."  (Aff. of Michael LeDuc (ECF No. 36-2) ¶ 6.)  LeDuc also had two conversations with Erenburg about the incident.  During the first conversation, LeDuc denied that anything serious had happened and told Erenburg that he did not "want to get involved."  (See Ex. 1 to Aff. of Kristin Erenburg (ECF No. 28-6), Page ID #s 177-78.)  During the second conversation, however, he told Erenburg that in fact Mailloux had "freaked out" and that he had been afraid Mailloux was going to hit him.  (Tradesmen Dep. at 82.)  LeDuc also called Tradesmen's Human Resources Department to report the incident because he "was scared to come into the office [because of Mailloux] . . . [a]nd Orne didn't follow through with his agreement with [him] to take care of the problem," but he was referred back to Erenburg.  (LeDuc Dep. at 134.)

To conduct its investigation of the October 15, 2016, incident, Tradesmen spoke with or contacted Porietis, LeDuc, Mailloux, the job fair organizer, the job fair sponsor, and at least one

of the Bangor police officers who manned the Police Department's table at the job fair.[6] Mailloux denied that there was any altercation or scene at the job fair. The job fair organizer and the job fair sponsor reported that they did not receive any complaints or hear about any inappropriate or unusual conduct occurring at Tradesmen's table from anyone at the mall or from any of the job fair participants.[7] The police officers did not see anything unusual occur at Tradesmen's table during the job fair. However, the officers may not have been manning the table at all times. (See Porietis Dep. at 130; LeDuc Dep. at 116-17; cf. Affidavit of Jason McAmbley (ECF No. 28-7); Affidavit of James Hassard (ECF No. 38-2).) Tradesmen did not contact any of the job applicants who had completed forms at Tradesmen's table.

Based on the results of its investigation, Erenburg made the decision to terminate Porietis and LeDuc on October 22 or 23, 2014. Both men were terminated on October 23 for making a false report in violation of company policy.[8] Tradesmen subsequently issued employment-related paperwork indicating that each man had been terminated for filing a false report and made this paperwork available to, among others, persons in the Human Resources and payroll departments. Tradesmen also represented to the Maine Human Rights Commission that Porietis and LeDuc had been terminated for making a false report, and represented to Equifax, the Maine Department of

---

[6] Although Tradesmen has submitted affidavits from both police officers regarding what they witnessed at the job fair, it is unclear from the record whether Tradesmen spoke to both police officers at the time of its investigation. (See Rule 30(b)(6) Deposition of Jeannie Woodall (ECF No. 34) at 92.)

[7] To the extent this information is present in the record in a form that looks like hearsay, the Court notes that it does not consider the statements by the job fair organizer and sponsor for the truth of the matter asserted (that they did not receive any complaints), but for the fact that the job fair organizer and sponsor *reported to Tradesmen* that they had not received any complaints.

[8] Plaintiffs do not appear to dispute that making a false report about what happened at the job fair would be a fireable offense pursuant to company policy.

Labor, and Labor Ready, a potential employer of LeDuc, that LeDuc had been terminated for misconduct.[9]

LeDuc applied for unemployment benefits with the State of Maine Department of Labor, Bureau of Unemployment Compensation. Tradesmen disputed his claim on the basis that LeDuc had been terminated for misconduct. Following a fact-finding process, the Department found that Tradesmen had failed to show that LeDuc had engaged in misconduct and awarded him benefits. Tradesmen appealed, appeared at the appeals hearing through Muscarella, offered exhibits and witness testimony, and was allowed to cross-examine both LeDuc and Porietis. On January 8, 2015, the Department of Administrative Hearings affirmed the decision, stating, in part,

> The employer has failed to meet its burden of establishing that the claimant engaged in either culpable misconduct or in a pattern of irresponsible behavior. The employer terminated the claimant for making a false report. The employer's investigation found that the claimant and his co-worker did not argue at all. The employer found that nothing of consequence occurred at the job fair whatsoever. However, the claimant credibly testified otherwise. The claimant and a witness to the event [Porietis] testified that an incident occurred between the claimant and the field representative that included yelling and cursing. Although parties at the event told the employer that they did not witness anything, that is not enough to conclude the argument never happened. The police officers at the table nearby could have been away from their area at the time. It was a job fair so it seemingly was not a quiet event to begin with. Moreover, the event coordinator could have been busy with something somewhere away from the claimant.
>
> The employer did not have witnesses with first-hand knowledge of the event at the hearing to testify. The employer representative testified about what the claimant said to his supervisor and to their legal counsel. However, they were not available to testify. There is no record evidence to show the claimant's testimony was not credible. There is no evidence of any motive for the claimant to make a false claim. Therefore, [there] is insubstantial evidence of record to show that the claimant's conduct was ever a breach of his duty to his employer.

(Pls.' Ex. A-8 (ECF No. 29-5), Page ID # 253.) Tradesmen was provided an appeal form with the decision but did not appeal.

---

[9] LeDuc also claims that Tradesmen told other entities about his firing but could not identify any by name. (See Deposition of Michael LeDuc ("LeDuc Dep.") (ECF No. 33) at 147-50.)

10

## III. DISCUSSION

Although Plaintiffs' Complaint (ECF No. 1-1) is not a model of clarity, it contains four counts. In Count I, Porietis claims that Tradesman violated the Maine Human Rights Act ("MHRA"), 5 M.R.S.A. §§ 4551-4634, and the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S.A. §§ 831-840.[10] In Count III, LeDuc states a similar individual claim for violations of both the MHRA and the MWPA. In Counts II and IV, each Plaintiff separately asserts a claim for defamation. Tradesmen seeks summary judgment on all four counts.

Before turning to Tradesmen's more expansive request for summary judgment, the Court first addresses Plaintiffs' discrete request for partial summary judgment, which argues for the application of administrative res judicata.

### A. Porietis and LeDuc's Motion for Partial Summary Judgment

Porietis and LeDuc move for summary judgment "on the issue of whether [they] were fired for making a false report." (Pls.' Mot. for Partial Summ. J. (ECF No. 29), Page ID # 198.) They contend that Tradesmen is barred from arguing that the reports regarding the incident at the job fair were false "by the doctrine of administrative res judicata" because the Maine Department of Labor concluded in the proceeding regarding LeDuc's claim for unemployment benefits that the reports were not false. (Id., Page ID # 199.)

The Court recognizes that the unemployment proceeding included many of the components that ordinarily support the application of issue preclusion: LeDuc and Tradesmen were parties to the unemployment proceeding, there was a decision on the merits concerning whether LeDuc had

---

[10] The Complaint expressly alleges that Porietis's "supervisor had created a hostile working environment based on sex." (Compl. (ECF No. 1-1) ¶ 5.) Thus, Tradesmen understandably moved for summary judgment on Porietis's claim of sexual harassment. (See Def.'s Mot. for Summ. J. (ECF No. 28), Page ID #s 109-111.) In response, Porietis has clarified that he is not asserting such a claim. (See Pls.' Response (ECF No. 35), Page ID # 572.) Thus, the Court addresses only the retaliation theory that Plaintiffs assert as their theory of recovery on Count I.

11

made a false report, and Tradesmen had adequate opportunity and incentive to litigate the issue. See Hebron Acad., Inc. v. Town of Hebron, 60 A.3d 774, 783 (Me. 2013) (explaining that, under Maine law, the "decisions of state and municipal administrative agencies are to be accorded the same finality that attaches to judicial judgments" (internal quotation marks omitted)); Town of Boothbay v. Jenness, 822 A.2d 1169, 1175 n.6 (Me. 2003) (describing the "essential elements of adjudication for purposes of administrative res judicata" (internal quotation marks omitted)); see also Bastille v. Me. Pub. Emp. Ret. Sys., No. 1:16-cv-31-NT, 2016 WL 4250256, at *4 & n.3 (D. Me. Aug. 10, 2016) (explaining that the federal court must give the same preclusive effect to a state administrative decision as it would be given by a state court). However, the Court concludes that applying issue preclusion in the manner urged by Plaintiffs is not appropriate for two reasons.

First, the Maine Employment Security Law, which governs unemployment compensation proceedings, provides, "Except for proceedings under this chapter, no finding of fact or conclusion of law contained in a decision of a deputy, an administrative hearing officer, the commission, the commissioner or a court, obtained under this chapter, has preclusive effect in any other action or proceeding." 26 M.R.S.A. § 1194(12).[11] The most logical reading of this statutory language is that findings of fact made in an unemployment benefits proceeding only have preclusive effect in *other unemployment proceedings*.

Second, the Court concludes that the essentially dissimilar burdens in the unemployment proceeding and the present action counsel against applying administrative res judicata. In Deschenes v. Sprague Elec. Co., No. CV-87-478, 1990 Me. Super. LEXIS 262, at *1-2 (Me. Super. Ct. Dec. 4, 1990), Maine Superior Court Justice G. Arthur Brennan reached a similar conclusion

---

[11] The Court agrees with Plaintiffs that the other provision cited by Tradesmen, 26 M.R.S.A. § 1043(23), is inapposite to the question at hand.

in a case where the current version of 26 M.R.S.A. § 1194 did not apply. Justice Brennan explained:

> In the pending civil action, plaintiff bears the burden of proving all elements in each of her causes of actions. To prevail on her claims, plaintiff must affirmatively prove that she did not engage in misconduct. A finding that defendant has not proven that plaintiff *did* [engage in misconduct] is not the same as plaintiff's proving that she *did not* [engage in misconduct].
>
> Section 28 of the Second Restatement on Judgments addresses exceptions to the general rule of issue preclusion and states that issue preclusion is not invoked when:
>
>> (4) The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; the burden has shifted to his adversary; or the adversary has a heavier burden than he had in the first action.
>
> Restatement (Second) of Judgments Ch. 3, § 28 (1982). Since the burdens of proof in both actions, although similar, are actually different, defendant should not be precluded from litigating the [misconduct] issue in the context of a civil action where it is plaintiff's burden to prove she did not commit the alleged misconduct.

Id. For these reasons, the Court DENIES Porietis and LeDuc's Motion for Partial Summary Judgment.

**B. Tradesmen's Motion for Summary Judgment**

Tradesmen moves for summary judgment on (i) Porietis's claim that his hours were cut in retaliation for refusing the strip club passes from Orne, in violation of the MHRA (Count I); (ii) Porietis and LeDuc's claims that they were fired for reporting Mailloux's behavior at the job fair, in violation of the MWPA (Counts I & III); and (iii) Porietis and LeDuc's claims that they were defamed by Tradesmen's dissemination of statements that they were fired for making a false report or misconduct (Counts II & IV). The Court considers each claim or set of claims in turn.

1. Porietis's Retaliation Claim

The MHRA provides that "[a] person may not discriminate against any individual because that individual has opposed any act or practice that is unlawful under this Act." 5 M.R.S.A.

§ 4633(1). To establish a prima facie case of retaliation in violation of the MHRA, an employee "must demonstrate that he engaged in a statutorily protected activity, that [the employer] made an employment decision that adversely affected him, and that there was a causal link between the two." Daniels v. Narraguagus Bay Health Care Facility, 45 A.3d 722, 728 (Me. 2012). Porietis contends that he engaged in protected activity when he refused the strip club passes from Orne, and that Orne reduced his hours in retaliation a week later.

A retaliation claim based on opposition to an unlawful activity does not require there to in fact have been underlying unlawful activity. Daniels, 45 A.3d at 728. However, a retaliation claim does require that the claimant communicated his opposition to what he perceived to be unlawful activity, either through "express statements of opposition" or "purposive conduct," such as "unsolicited, post-investigation letters [to an employer's HR department] concerning how [an] allegation of harassment had been handled" by the employer. Pippin v. Boulevard Motel Corp., 835 F.3d 180, 184-85 (1st Cir. 2016) (internal quotation marks omitted); see also Daigle v. Stulc, 794 F. Supp. 2d 194, 237 (D. Me. 2011) (stating that protected activity "includes not only the filing of administrative complaints but also complaining to one's superiors" (internal quotation marks omitted)). In short, this Court's review of the relevant case law indicates that an employee can engage in protected activity in a variety of ways provided that he reasonably indicates that he is opposing what he perceives to be unlawful activity. See Rodriguez-Hernandez v. Miranda-Velez, 132 F.3d 848, 855 (1st Cir. 1998) (citing with approval, in the general context of retaliation suits, the proposition that a "plaintiff establishes a retaliation claim if she shows that she had a reasonable belief that the employer was engaged in an unlawful employment practice and that the employer retaliated against her for protesting that practice" (internal quotation marks omitted)).

Viewing the facts in the light most favorable to Porietis, the Court concludes that there is a trialworthy issue as to whether Porietis's response to Orne on September 26, 2014, amounted to a complaint opposing what Porietis believed was improper and unlawful activity. It is true, as Tradesmen argues, that is it insufficient for Porietis to have simply indicated that he found Orne's offer inappropriate. "[U]nder the Maine Human Rights Act, retaliation for complaining about a hostile work environment [is] not alone actionable." Stinson v. Simplexgrinnell LP, 394 F. Supp. 2d 280, 281 (D. Me. 2005). Rather, at the summary judgment stage, there must be trialworthy evidence that retaliation was the result of a complaint tied to one of the MHRA's protected categories, such as sex. See id. (dismissing a complaint that alleged a "hostile work environment" but did not allege that the plaintiff complained to her employer that the work environment was *sexually* hostile). Porietis hits this mark.[12]

With the first element satisfied, Porietis can also satisfy the other elements of a prima facie case for retaliation under the MHRA. If the Court proceeds to consider the record under the McDonnell Douglas burden-shifting framework, the Court acknowledges that Defendant has produced evidence, albeit disputed, of an alternative explanation for the October 2, 2014, decision to cut Porietis's hours. Then, shifting the burden back to Plaintiff, the Court concludes that there is a triable issue as to what explanation a factfinder would credit as causing the change in Porietis's work schedule.[13]

---

[12] The Court suspects that Porietis understands that his evidence on this point is not overwhelming. As a result, he has attempted, by affidavit, to allege for the first time that he "indicated to [Orne] that I found his behavior offensive" based on a belief that "the injection of this sexual business into the office created a sexually hostile environment." (Aff. of Porietis (ECF No. 36-3), Page ID # 642.) As Tradesmen concedes, Porietis likely *did* engage in protected conduct when he spoke to Erenburg about Orne's actions, Def.'s Mot. for Summ. J., Page ID # 112, but that was *after* the alleged retaliation.

[13] The Court notes that it is not clear that application of the McDonnell Douglas framework is required for an MHRA retaliation claim in light of Brady v. Cumberland Cty., 126 A.3d 1145, 1158 (Me. 2015) (holding that the McDonnell Douglas burden-shifting framework is not applicable to MWPA retaliation cases on summary judgment).

15

Therefore, the Court DENIES Defendant's motion as to Porietis's claim of retaliation under the MHRA.

2. Porietis and LeDuc's Whistleblower Claims

The MWPA provides, "No employer may discharge . . . an employee . . . because . . . [t]he employee, acting in good faith . . . reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. § 833(1)(B). The elements of a prima facie MWPA claim are

> (1) that the employee engaged in activity protected by the WPA [*i.e.*, makes a qualifying report about a dangerous condition or practice]; (2) that the employer imposed adverse employment action against the employee; and (3) that there was a causal connection between the protected activity and the adverse employment action.

Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 948 (Me. 2015).[14]

An employee's report "is supported by reasonable cause when the employee has a subjective and objectively reasonable belief that a dangerous condition or practice exists." Id. at 949. The condition or practice can be the actions of a co-worker. See, e.g., Daigle, 794 F. Supp. 2d at 238 (explaining that reporting a co-worker's conduct may constitute protected activity). "Good faith" means that the employee was motivated to make the report "at least in part" by a desire to stop the dangerous condition. Currie v. Indus. Sec., Inc., 915 A.2d 400, 407 (Me. 2007). The "causal connection" inquiry includes consideration of whether the employer's purported non-retaliatory reason for its employment action is pretextual. Brady v. Cumberland Cty., 126 A.3d 1145, 1156 (Me. 2015) ("Because of the way a WPA claim is defined under Maine law, in a

---

[14] "Although the MWPA provides no private right of action, plaintiffs may file a civil action under the MHRA." Osher v. Univ. of Me. Sys., 703 F. Supp. 2d 51, 64 n.13 (D. Me. 2010). Tradesmen does not dispute that Plaintiffs can make the requisite showing of an adverse employment action. (Def.'s Mot. for Summ. J., Page ID #s 113-15.)

summary judgment motion—just as at trial—the employee must not only produce evidence that she engaged in protected activity and later suffered an adverse employment action, but in the first instance she must also produce some evidence of the employer's unlawful motivation.").[15]

Tradesmen contends that Porietis and LeDuc cannot meet their prima facie burden because their reporting of Mailloux's behavior was not supported by "reasonable cause" and was not made in "good faith."[16] The Court disagrees. Keeping in mind that an "employee's burden of proving a prima facie case of retaliation is relatively light," Brady, 126 A.3d at 1151 (internal quotation marks omitted), and considering the evidence in the light most favorable to Plaintiffs, a reasonable jury could conclude that Porietis's and LeDuc's reporting was supported by "reasonable cause" and made in "good faith." Tradesmen selectively quotes the record to suggest that the two men were simply embarrassed on Tradesmen's behalf by Mailloux's behavior, but there is sufficient evidence for a reasonable jury to conclude that the two men *subjectively* believed that Mailloux had acted aggressively and posed a danger of future violence. A reasonable jury could also conclude that a person getting in a co-worker's face, cursing and spitting at him, making fists, and pushing a table could support an *objectively* reasonable belief that the person poses a danger.

---

[15] In Brady, the Maine Supreme Judicial Court held that the McDonnell Douglas burden-shifting framework for employment discrimination actions is inapplicable to MWPA claims on summary judgment because "the second and third phases of the McDonnell Douglas model," the employer's burden to present evidence of a non-retaliatory reason for the employment action and the employee's burden to present evidence that this reason is pretextual, are "duplicative" given that the employee must present evidence of the employer's improper motivation as part of the employee's prima facie case. Brady, 126 A.3d at 1157. The Court is not sure how this accords with the proposition that "[t]emporal proximity of an employer's awareness of protected activity and the alleged retaliatory action may serve as the causal link for purposes of a prima facie case." Cormier v. Genesis Healthcare LLC, 129 A.3d 944, 951 (Me. 2015) (internal quotation marks omitted). However, the Court does not apply the McDonnell Douglas burden-shifting framework in light of Brady and the general proposition that, on summary judgment, "a court may often dispense with strict attention to the burden-shifting framework, focusing instead on whether the evidence as a whole is sufficient to make out a jury question as to pretext and discriminatory animus." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996).

[16] Tradesmen states that "*even assuming for purposes of this Motion that* [Plaintiffs'] *allegations about Mr. Mailloux are true, Plaintiffs cannot succeed on their whistleblower claims as a matter of law*." (Def.'s Mot. for Summ. J., Page ID # 114.) However, Tradesmen also argues that the reports were not made in good faith because they were false. (Id., Page ID # 115.) The Court does not consider this latter argument precisely because, for summary judgment purposes, it assumes the truth of the Plaintiffs' allegations concerning Mailloux.

Finally, there is sufficient evidence for a reasonable jury to conclude that Porietis and LeDuc were motivated to report at least in part by a desire to ensure that Mailloux's conduct did not continue in the future.

Regarding the "causal connection" element, Tradesmen has presented the non-retaliatory reason for firing Porietis and LeDuc that they made false reports in violation of company policy. The Court thus must consider whether no reasonable jury could conclude that this reason for firing them was pretextual. Generally, pretext in an employment discrimination action can be discerned, among other ways, from "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the employer's explanation or from "comments . . . made by the key decisionmaker or those in a position to influence the decisionmaker." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 55-56 (1st Cir. 2000) (internal quotation marks omitted). In this case, there is sufficient evidence from which a reasonable jury could discern pretext, including: (i) the weaknesses in Tradesmen's investigation, such as not contacting any of the job applicants to see if they had witnessed anything at the job fair; and (ii) the comments to LeDuc by Orne and Erenburg suggesting antipathy towards Porietis, antipathy that could have extended to LeDuc once he corroborated Porietis's report of Mailloux's behavior.

For these reasons, the Court DENIES Tradesmen's Motion as to Porietis and LeDuc's MWPA claims.[17]

3. Porietis and LeDuc's Defamation Claims

The elements of a defamation claim under Maine law are "(a) a false and defamatory

---

[17] The Complaint does not allege that Porietis was fired for complaining about any perceived violations of company regulations by other employees at the Portland office, nor does the Complaint clearly allege that he was *fired* for complaining about the alleged retaliation when his hours were cut. (See Compl., Page ID # 10.) Porietis cannot introduce such allegations in passing at this stage of the litigation. (See Pls.' Response, Page ID # 580.)

18

statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." Lester v. Powers, 596 A.2d 65, 69 (Me. 1991). Tradesmen contends that it is entitled to summary judgment on the defamation claims because the statements at issue are not false, and because the statements were privileged and thus cannot form the basis of a defamation claim.

Some of the statements identified by the Plaintiffs are *absolutely* privileged because they were made in administrative proceedings, to unemployment-related agencies, or to the Maine Human Rights Commission. Kelley v. Corr. Med. Servs. Inc., No. 1:10-cv-00451-DBH, 2011 WL 3490084, at *22 n.18 (D. Me. Aug. 8, 2011) (magistrate's recommended decision), adopted by, 2011 WL 4585239 (D. Me. Sept. 30, 2011), vacated on other grounds, 707 F.3d 108 (1st Cir. 2013); LaPlante v. United Parcel Serv., Inc., 810 F. Supp. 19, 21 (D. Me. 1993); Dineen v. Daughan, 381 A.2d 663, 664 (Me. 1978).

However, the statements made *within* Tradesmen and the statements made to Labor Ready are subject only to a *conditional* privilege. See Cole v. Chandler, 752 A.2d 1189, 1193-94 (Me. 2000) (explaining the general rationale behind the conditional privilege, including as it applies to assessments of job performance); Staples v. Bangor Hydro-Elec. Co., 629 A.2d 601, 604 (Me. 1993) (conditional privilege applies to statements made within a company); Heselton v. Wilder, 496 A.2d 1063, 1067 (Me. 1985) (same). The conditional privilege is forfeited if the statement's originator made it "with malicious intent," meaning that the originator "knows [the] statement to be false, recklessly disregards its truth or falsity, or acts with spite or ill will." Cole, 752 A.2d at 1194 (internal quotation marks omitted). "Whether the defendant abused his privilege is a question of fact." Id. Furthermore, the statements to Equifax can support a defamation claim despite the

19

Fair Credit Reporting Act's preemption of state law defamation claims to the extent the statements were made with the knowledge that they were false.[18]  15 U.S.C. § 1681h(e); Barrepski v. Capital One Bank (U.S.A.) N.A., Civil Action No. 11-30160-NMG, 2014 WL 935983, at *12-13 (D. Mass. Mar. 7, 2014) (order adopting magistrate's recommended decision); Watson v. Trans Union Credit Bureau, No. CIV. 04-205-B-C, 2005 WL 995687, at *8 (D. Me. Apr. 28, 2005).

The Court concludes that a reasonable jury could determine that Tradesmen abused any conditional privilege and is thus liable for defamation.  Specifically, a reasonable jury could conclude that although Tradesmen reported that Porietis and LeDuc had officially been fired for filing a false report, Tradesmen knew that, in fact, the two men had been fired as a result of Tradesmen's ill will towards Porietis and in retaliation for the men complaining about Mailloux's conduct.  See Swift v. Bank of Am., Civ. No. 08-35-B-W, 2009 WL 723521, at *17 (D. Me. Mar. 16, 2009) ("Contrary to what Bank of America suggests, the question is not whether Bank of America (or Swift) truthfully reported Bank of America's reason for terminating Swift, but whether the reason itself was true.").  For this reason, the Court DENIES Tradesmen's Motion as to the defamation claims.

## IV.   CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 3rd day of January, 2017.

---

[18] The Court agrees with Tradesmen that Plaintiffs cannot base their defamation claims on alleged statements by Tradesmen to unidentified parties.  (See Def.'s Mot. for Summ. J., Page ID # 117.)